# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARK SKAPINETZ, | * | |
|    Plaintiff, | * | |
| v. | * | Civil Action No. 8:17-cv-01098-PX |
| COESTERVMS.COM, INC., *et al.*, | * | |
|    Defendants. | * | |

***

## MEMORANDUM OPINION

Pending before the Court is Plaintiff and Counter-Defendant Mark Skapinetz' motions for summary judgment (ECF Nos. 98 & 100); Defendant and Counter-Plaintiff CoesterVMS.com, Inc. ("CoesterVMS")'s motion for reconsideration (ECF No. 87); counsel for CoesterVMS' motion to withdraw (ECF No. 90); and Skapinetz' requests for attorneys' fees. ECF Nos. 68 & 86. Although several motions have been briefed by each side, the motions for summary judgment and the second request for attorneys' fees went unopposed.[1] No hearing on these motions is necessary. *See* Loc. R. 105.6. For the following reasons, the Court grants the motions for summary judgment, denies the motion for reconsideration, grants the motion to withdraw, and denies without prejudice the requests for attorneys' fees.

### I. Skapinetz' Motions for Summary Judgment

#### A. Background

At the center of this case is a single email authored by Plaintiff, Mark Skapinetz, about Brian Coester and his business, CoesterVMS. Skapinetz, a real estate appraiser based in Georgia, had performed appraisals as a subcontractor for CoesterVMS, an appraisal management

---

[1] Apparently, CoesterVMS did not authorize counsel to file oppositions to the motions for summary judgment. ECF No. 103 at 1. Coester also has not opposed the motions for summary judgment.

company. ECF No. 100-3 at 5. On November 10, 2016, Skapinetz sent a CoesterVMS client an email critical of CoesterVMS, describing the operation as a "criminal and fraudulent company," and attaching documents reflecting ongoing litigation between CoesterVMS and a third party. ECF No. 10-2 at 2. Skapinetz sent the email unsigned, but from his personal, mappraiser14@gmail.com account. *Id.*; ECF No. 100-2 at 3. The recipient and CoesterVMS client, Finance of America, forwarded the email to Brian Coester with the following message: "Hey Bro because I really like you and I respect you and think you need to see that this mappraiser14@gmail.com is sending me this crap to disparage your name." ECF No. 10-2 at 1.

Coester became concerned about the email and decided to investigate the identity of the author, using the help of a CoesterVMS development contractor. ECF No. 100-3 at 6; ECF No. 100-4 at 2. The contractor identified the last four digits of the telephone number associated with the email address. ECF No. 100-4 at 2. Using the computer located in his office, Coester entered the digits into a CoesterVMS sales database, which generated a list of individuals whose phone numbers included those digits. ECF No. 100-4 at 2. Skapinetz was among those listed. *Id.* Because of Coester's role as CEO and owner, he was able to access the database that also included the password Skapinetz had used to log into the CoesterVMS online appraiser site. ECF No. 100-3 at 7.

Much to Coester's surprise, he was able to log into Skapinetz' mappraiser14@gmail.com account using the same password. *Id.*; ECF No. 100-4 at 2. Nothing in the record suggests that in connection with their business relationship, Skapinetz had ever given Coester or CoesterVMS permission to obtain wholesale access to his Gmail account. Once logged in, Coester saw the emails in Skapinetz' account, including emails from the Finance of America appraiser, as well as another individual Robert Scheer, with whom Coester was engaged in ongoing litigation. ECF

2

No. 100-3 at 8.

Coester next logged out of the mappraiser14@gmail.com account and attempted access into Skapinetz' business email account, wiwapp@gmail.com. *Id.* Coester contends that he did so to confirm Skapinetz' identity as author of the disparaging email and to also learn whether Skapinetz possessed any unlawfully obtained confidential and proprietary information related to CoesterVMS. Coester also wanted to learn to what extent Skapinetz sought to harm CoesterVMS, and the nature of his Skapinetz' connection, if any, to Scheer. ECF No. 100-4 at 3.

Coester successfully logged into the wiwapp@gmail.com account using the same password and searched the emails. ECF No. 100-3 at 8; ECF No. 100-1 at 4.[2] Coester also printed four of Skapinetz' emails. ECF No. 100-3 at 10. Like the mappraiser14@gmail.com account, Skapinetz never gave Coester permission to access this account. ECF No. 100-1 at 4.

Skapinetz received a security alert that his mappraiser14@gmail.com account had been accessed from an unrecognized device in Maryland. ECF No. 100-2 at 3; ECF No. 1-1 at 1. Skapinetz—who lives in Georgia—deleted the entire Gmail account because of security concerns and did not preserve any content in the account prior to deleting it. ECF No. 1-2 at 1; ECF No. 100-2 at 3. Skapinetz, however, continued to use his wiwapp@gmail.com account. *Id.* at 2. Both email accounts were hosted on web-based email platforms run by Google and used Google's servers. ECF No. 100-2 at 2.

On April 20, 2017, Skapinetz filed suit against Coester and CoesterVMS, alleging violations of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, *et seq.*, and common law claims for trespass to chattels, trespass to land, conversion, fraud, and invasion of privacy. ECF No. 1. After the Court dismissed the trespass to land and fraud claims (ECF Nos. 16 & 17),

---

[2] Elsewhere, Coester denies remembering running any searches. ECF No. 100-3 at 11.

Coester and CoesterVMS filed counterclaims against Skapinetz for tortious interference with contract and economic relations. ECF No. 40. After a protracted discovery process, Skapinetz now seeks summary judgment in his favor on his claims as well as Defendants' counterclaims.

**B.      Standard of Review**

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In responding to a proper motion for summary judgment," the opposing party "must present evidence of specific facts from which the finder of fact could reasonably find for him or her." *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 840 (D. Md. 2004), *aff'd sub nom. Venugopal v. Shire Labs., Inc.*, 134 F. App'x 627 (4th Cir. 2005) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986); *Celotex*, 477 U.S. at 322–23)). Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Where a party's statement of a fact is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court credits the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

C.  **Analysis**

1.  **Stored Communications Act**

Skapinetz argues that Coester and CoesterVMS violated the Stored Communications Act ("SCA") when Coester accessed his email accounts. The SCA provides a right of action against anyone who "intentionally accesses without authorization a facility through which an electronic communication is provided . . . and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system . . . ." 18 U.S.C. §§ 2701(a), 2707(a). To prevail under the SCA, Skapinetz must prove that Defendants (1) accessed a system through which electronic communication service is provided without authorization; (2) obtained a wire or electronic communication from the electronic storage system; and (3) acted intentionally. *Hately v. Torrenzano*, No. 1116CV01143GBLMSN, 2017 WL 2274326, at *6 (E.D. Va. May 23, 2017).

With respect to Coester, the uncontroverted evidence compels summary judgment in Skapinetz' favor. On the first element, Coester admits that he accessed Skapinetz' email accounts without authorization. ECF No. 100-1 at 4. No evidence has been generated to the contrary. Equally uncontroverted, Coester obtained the email communication while it was in electronic storage through Google. ECF No. No. 100-2 at 2. Because Gmail provides users with the ability to send and receive emails, Gmail qualifies as a "facility through which an electronic communication is provided." *See* 18 U.S.C. § 2510(12) (defining "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce"); 18 U.S.C. § 2711(1); *see also Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 963–64 (11th Cir. 2016).

Coester obtained electronic communications while the communications were in electronic storage in such system. Electronic storage encompasses both "storage incidental to transmission" and "backup storage." *Hately v. Watts*, 917 F.3d 770, 784 (4th Cir. 2019) (quoting H.R. Rep. No. 99-647, at 68) (internal quotation marks omitted); *see also* 18 U.S.C. §§ 2510(17), 2711(1). Unopened emails stored on a server are being stored incidental to their transmission. *See In re DoubleClick Inc. Privacy Litigation*, 154 F. Supp. 2d 497, 512 (S.D.N.Y. 2001) (noting that incidental storage includes "when an email service stores a message until the addressee downloads it"). The same is true for emails previously delivered and opened; they too are "stored for purposes of backup protection." *Watts*, 917 F.3d at 797.

Coester viewed numerous delivered emails in both accounts, and he printed four emails, including three delivered emails and one sent email. ECF No. 100-3 at 8, 10; ECF Nos. 100-7–10. All of these emails constitute electronic communications stored in such system. Coester's actions, viewed most favorably to Defendants, thus satisfy the second element of the SCA. *See Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 976 (M.D. Tenn. 2008) (stating that a violation of the SCA occurs where a person "review[s]" the materials in an email account).

Finally, the unrebutted evidence viewed most favorably to Defendants demonstrates that Coester acted intentionally. Although the SCA does not define "intentionally," the legislative history demonstrates that Congress intended the meaning to be "'narrower than the dictionary definition.'" *Butera & Andres v. Int'l Bus. Machines Corp.*, 456 F. Supp. 2d 104, 109 (D.D.C. 2006) (quoting S.Rep. No. 99-541, at 23 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3577)). Thus, under the SCA, a defendant acts intentionally if his conduct or its result is a product of his conscious objective; inadvertent access will not suffice. *Freedman v. Am. Online, Inc.*, 325 F. Supp. 2d 638, 645 n.11 (E.D. Va. 2004); *see also In re Pharmatrak, Inc.*, 329 F.3d 9, 23 (1st Cir.

2003).

Coester admits to taking several deliberate steps with the singular purpose of obtaining and reading Skapinetz' email without authorization and to further Coester's own personal and business objectives. Coester confessed that he searched his company's database for Skapinetz' email and password; used them with the purpose of getting into the emails; succeeded in accessing the emails, then searched, read and printed the emails because he wanted to learn more about Skapinetz' knowledge of CoesterVMS' business as well as his relationship with Scheer. ECF No. 100-4 at 3. Nothing about Coester's self-admitted conduct reflects accident, carelessness or mistake. Rather, it is sufficiently purposeful to satisfy the third element of the claim. *See Chadha v. Chopra*, No. 12 C 4204, 2012 WL 6044701, at *2 (N.D. Ill. Dec. 5, 2012) ("[T]he Court cannot conceive of[] any possible way that Chopra might have unintentionally (1) obtained the username and password for Puja's Hotmail Account; (2) used that information to log into the account; and (3) accessed emails in the account's inbox to obtain email addresses."). Skapinetz is entitled to summary judgment on his SCA claim against Coester.

As for the SCA claim against CoesterVMS, the SCA recognizes derivative liability based on a theory of respondeat superior. *See Thacker v. Cuyahoga Heights Bd. of Educ.*, No. 1:16-CV 2706, 2017 WL 2271433, at *4 (N.D. Ohio May 23, 2017); *see also Butera*, 456 F. Supp. 2d at 112. Although a split of authority exists as to whether the Court adopts state law or general common law in assessing liability, *compare Murphy v. Spring*, 58 F. Supp. 3d 1241, 1266 n.17 (N.D. Okla. 2014), *with Larson v. Hyperion Int'l Techs., LLC*, 494 F. App'x 493, 495 (5th Cir. 2012), summary judgment is warranted against CoesterVMS under either standard.[3]

---

[3] *See also Chin v. Wilhelm*, 291 F. Supp. 2d 400, 403 (D. Md. 2003) (applying the law of respondeat superior in the state where the alleged tort occurred for the Federal Tort Claims Act); *Williams v. Cloverland Farms Dairy, Inc.*, 78 F. Supp. 2d 479, 485 (D. Md. 1999) (applying the general common law of respondeat superior for 42 U.S.C. § 1981).

With regard to state common law, the Court has previously applied Georgia law to the claims and will do so here. ECF No. 16 at 11; *see also Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 620 (2007); *Withers v. Riggs Nat'l Bank*, No. 87-2530, 829 F.2d 37 (Table), 1987 WL 44689, at *1 (4th Cir. Sept. 2, 1987). Under Georgia law, an employer is liable for the acts of an employee which are in furtherance of and within the scope of the employer's business. *Piedmont Hops., Inc. v. Palladino*, 276 Ga. 612, 613 (2003); *Boyd v. United States*, No. 1:12-CV-2537-WSD, 2012 WL 6728994, at *2 (N.D. Ga. Dec. 27, 2012). General common law principles impose liability on the acts of employees taken within the scope of employment, which is conduct of the kind the employee is employed to perform, occurs substantially within authorized time and space limits, and is actuated, at least in part, by a purpose to serve the employer. *See Meyer v. Holley*, 537 U.S. 280, 285 (2003); Restatement (Second) of Agency § 228.

When viewing the evidence most favorably to CoesterVMS, Coester acted within the scope of his employment when accessing Skapinetz' emails. As the CEO and sole owner of CoesterVMS, Coester *is* CoesterVMS for practical purposes. ECF No. 100-3 at 4–5. In fact, Coester admits that he is ultimately responsible for "everything at the company." *Id.* at 5.

As CEO and owner, Coester maintained full access to the CoesterVMS database, including users' passwords, access which he used to obtain Skapinetz' emails. ECF Nos. 100-5, 100-3 at 14. Coester also used a CoesterVMS contractor to help him investigate the identity of the author. *Id.* at 6. Finally, Coester accessed the emails to discover the identity of the person who characterized CoesterVMS as "criminal and fraudulent" to another CoesterVMS client. ECF No. 10-2 at 2. Coester thus acted, at least in part, to further the interests of CoesterVMS. ECF No. 100-4 at 3. That Coester may have violated his own company policy in using Skapinetz' email password does not put his conduct outside the scope of his employment. *See*

*U.S. Tobacco Cooperative Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 260 (4th Cir. 2018); *Barfield v. Royal Ins. Co. of Am.*, 228 Ga. App. 841, 844 (1997). Conduct which supports civil liability will often violate company policy, but if the same conduct also furthers the business interests of the employer, it falls within the scope of his employment. The record evidence, viewed most favorably to CoesterVMS, establishes its vicarious liability under the SCA.

As to damages, Skapinetz requests trial where he intends to pursue statutory and punitive damages as well as attorneys' fees. ECF No. 100 at 1, 23. Punitive damages are available where the SCA violations are "willful or intentional," 18 U.S.C. § 2707(c), and whether to award such damages remains within the Court's discretion. *Vista Mktg.*, 812 F.3d at 977. However, because any SCA violation requires intentionality, the statute affords little guidance as to the nature of conduct warranting punitive damages. *See Vista Mktg.*, 812 F.3d at 975 n.15 ("[A]s a practical matter, virtually all violations under § 2707(a) are subject to an award of punitive damages."); *see also Gen. Dynamins Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004). On the current record, clearly Coester and CoesterVMS violated the SCA with the requisite intentionality as well as engaged all manner of discovery violations, which together may warrant punitive damages. *Cf. N. Am. Mktg. Sols., Inc. v. Wright*, No. 13-C-472, 2014 WL 2991127, at *1 (E.D. Wis. July 1, 2014) (awarding punitive damages under the SCA where the defendant "refused to participate in this litigation in an apparent attempt to make it more difficult . . . to obtain relief."). A damages trial will undoubtedly focus on the propriety of punitive damages here.

The SCA also permits relief in the form of "a reasonable attorney's fee and other litigation costs reasonably incurred." 18 U.S.C. § 2707(b)(3). Such award seems appropriate in this case. *See Wright*, 2014 WL 2991127, at *2. However, because the Court has previously

9

found Defendants' discovery violations merit sanctions under Federal Rule of Civil Procedure 37, the Court intends to consolidate all fee petitions into one proceeding so as to avoid double recovery. *See Hadeed v. Abraham*, 103 F. App'x 706, 708 (4th Cir. 2004) ("[T]he Abrahams cannot recover the same costs twice . . . ."); *Killette v. Pittman*, 127 F.3d 1099 (Table), No. 96-1827, 1997 WL 657005, at *7 n.8 (4th Cir. Oct. 22, 1997). To accomplish this objective, the Court denies Skapinetz' attorneys' fees requests brought by separate motion (ECF Nos. 68 & 86) without prejudice so that the same fees may be incorporated into a single, global request for attorneys' fees and costs necessary to prosecute these claims.

### 2. Trespass to Chattels

Based on the same, uncontroverted record, the Court grants summary judgment on the trespass to chattels claim. Georgia law defines trespass to chattels as "[a]ny unlawful abuse of or damage done to the personal property of another." Ga. Code § 51-10-3. The gist of a trespass to personal property is the injury done to possession. *Caldwell v. Church*, 341 Ga. App. 852, 856 (2017). Interference with electronic communication networks can constitute a "digital trespass" to chattel. *See AT&T Mobility, LLC v. Does 1–4*, No. 1:09-CV-00277-JOF, 2011 WL 13213864, at *2 (N.D. Ga. May 26, 2011) (finding unsolicited calls trespassed on telephones, telephone networks, and switching and transmission facilities).

Coester's logging into Skapinetz' email accounts without authorization amounts to unlawful interference with the possession of those accounts. *See Mey v. Got Warranty, Inc.*, 193 F. Supp. 3d 641, 646 (N.D. W. Va. 2016); *Microsoft Corp. v. Does 1–18*, No. 1:13CV139 LMB/TCB, 2014 WL 1338677, at *10 (E.D. Va. Apr. 2, 2014). Coester's interference also damaged the value of the accounts by breaching the security and privacy reasonably associated with a password-protected email account. Indeed, Google alerted Skapinetz to the breach of his

10

privacy, which prompted his immediate deletion of the account. ECF No. 100-2 at 3. Defendants have not generated contrary evidence. Thus, taking all reasonable inferences in the light most favorable to Defendants, Skapinetz has demonstrated that Coester committed a trespass to chattels for which CoesterVMS is vicariously liable. *See also Whatley v. Manry*, 60 Ga. App. 273 (1939) (finding vicarious liability for trespass to personal property); *Gloss v. Jacobs*, 86 Ga. App. 161, 166 (1952) ("Both the principal and the agents would be liable in a proper case."). Summary judgment is granted in Skapinetz' favor on this claim.

### 3. Conversion

Under Georgia law, conversion is "the unauthorized assumption and exercise of the right of ownership over personal property belonging to another which is contrary to the owner's rights." *Taylor v. Gelfand*, 233 Ga. App. 835, 837 (1998) (quoting *Reeves v. Edge*, 225 Ga. App. 615, 619 (1997)). "Any act of dominion wrongfully asserted over another's personal property which is in denial of his property rights, or inconsistent with them, is a conversion." *Ewaldsen v. Atlantic Ins. Brokers, LLC*, 267 Ga. App. 347, 349 (2004) (citations and quotation marks omitted). Conversion encompasses "tangible personalty or specific intangible property." *Taylor v. Powertel, Inc.*, 250 Ga. App. 356, 358-59 (2001).

To sustain this claim, a plaintiff must show "title to the property, possession by the defendant, demand for possession, and refusal to surrender the property." *Powertel*, 250 Ga. App. at 358. However, when a plaintiff contends that a defendant came into possession of the property unlawfully, the plaintiff need not show a demand for the property and a refusal to return it to establish their claim. *See AT&T Mobility LLC v. Does 1–4*, Case No. JOF-09-277, 2012 WL 13001387, at *3 (N.D. Ga. Mar. 29, 2012) (denying a motion to dismiss where plaintiff pled that telemarketers exercised wrongful dominion and control over their property by sending

11

unauthorized telemarketing calls).

The undisputed evidence shows that Skapinetz owned the email accounts. ECF No. 100-2 at 2–3. The evidence also demonstrates that Coester came into possession of the email accounts unlawfully and printed emails for his personal use and possession. ECF No. 100-4 at 2–3. Thus, taking all reasonable inferences in the light most favorable to Defendants, Skapinetz has proven conversion of his property. *See Trotman v. Velociteach Project Mgmt., LLC*, 311 Ga. App. 208, 213 (2011); *see also Microsoft Corp.*, 2014 WL 1338677, at *9–10. As discussed above, CoesterVMS is vicariously liable for Coester's conversion. *See Trey Inman & Assocs., P.C. v. Bank of Am., N.A.*, 306 Ga. App. 451, 457 (2010) ("Whoever meddles with another's property, whether as principal or agent, does so at his peril[.]"). Summary judgment is granted in Skapinetz' favor on this claim.

### 4. Intrusion Upon Seclusion

Georgia recognizes a tort of intrusion upon a person's seclusion or solitude, or into his private affairs. *Yarbray v. S. Bell Tel. Co.*, 261 Ga. 703, 705 (1991). Such an intrusion is actionable if the invasion "involves a prying or intrusion, which would be offensive or objectionable to a reasonable person, into a person's private concerns." *Anderson v. Mergenhagen*, 283 Ga. App. 546, 549 (2007). "[U]nauthorized surveillance, by means of eavesdropping, wiretapping, or otherwise, may constitute invasion of privacy." *Yarbray*, 261 Ga. at 705 n.3.

Coester accessed Skapinetz' personal and work emails without authorization by looking up Skapinetz' password from a protected database. ECF No. 100-5 at 6 (describing controls that limited access to password information on database). Skapinetz undertook this surveillance specifically to monitor Skapinetz' communications and relationships with third-parties. These

actions undoubtedly would offend a reasonable person's expectation of privacy. *See Sneed v. SEI/Aaron's, Inc.*, No. 1:13-CV-982-TWT, 2013 WL 6669276, at *2 (N.D. Ga. Dec. 18, 2013); *cf.* S. Rep. 99-541, at 5 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3559 (noting that American citizens expect privacy in their electronic communications). Nor can Coester mount any reasonable justification for spying on his own client's private communications. *Cf. Sitton v. Print Direction, Inc.*, 312 Ga. App. 365, 370 (2011) (employer's actions in reviewing employee emails on work computer reasonable to learn whether employee engaged in unauthorized competition); *Bodrey v. Cape*, 120 Ga. App. 859, 867 (1969) (parent); *Ellenberg v. Pinkerton's, Inc.*, 130 Ga. App. 254, 257 (1973) (defendant in lawsuit at time of reasonable surveillance). Taking all inferences in the light most favorable to Defendants, Coester's surveillance of Skapinetz' emails amounted to an unreasonable intrusion into Skapinetz' privacy for which he and CoesterVMS are liable. *See McDaniel v. Atlanta Coca-Cola Bottling Co.*, 60 Ga. App. 92 (1939) (holding surveillance of a private conversation was an intrusion upon seclusion attributable to principal). Summary judgment is granted in Skapinetz' favor for this claim.

### 5. The Counterclaims

The Defendants have brought counterclaims for tortious interference based on Skapinetz' sending the November 2016 email to a CoesterVMS' client. ECF No. 40. Tortious interference with contracts protects the performance of a contract, while tortious interference with economic relations protects against interference where no contract is involved. *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 298 (1994).[4] To succeed on either claim, the Defendants (as Counter-Plaintiffs) must prove Skapinetz engaged in "'(1) intentional and wilful [sic] acts; (2) calculated to cause damage to [Counter-Plaintiffs] in their lawful business; (3) done with the unlawful

---

[4] Because the alleged injury to CoesterVMS occurred in Maryland, the Court applies Maryland law.

purpose to cause such damages and loss, without right or justifiable cause on the part of [Counter-Defendant] (which constitutes malice); and (4) actual damage and loss resulting.'" *Blondell v. Littlepage*, 413 Md. 96, 125 (2010) (quoting *Kaser v. Fin. Protection Mktg., Inc.*, 376 Md. 621, 628–29 (2003)).

Skapinetz contends principally that the tortious interference with economic relations claim fails as a matter of law because no record evidence demonstrates actual damage or loss resulting from the email. Skapinetz is correct. Coester and CoesterVMS cannot show any lost business revenue or other tangible harm arising from a single email sent to a single client on a single occasion. Summary judgment in Skapinetz' favor is granted as to this counterclaim. *See Pandora Jewelry, LLC v. Chamilia, LLC*, No. CCB-06-3041, 2008 WL 4533902, at *4 (D. Md. Sept. 30, 2008).

As to the tortious interference with contracts claim, the record evidence, at best, shows that shortly after Skapinetz sent the email, two clients, Finance of America and LoanDepot, parted company with CoesterVMS. *See* ECF No. 98-2 at 5; ECF No. 40 ¶ 15. However, no record evidence supports that CoesterVMS lost these clients because of Skapinetz' email. Critically, for the claim to survive, the nonmovant must generate some evidence proving that the tortious conduct proximately caused business loss. *Lyon v. Campbell*, 120 Md. App. 412, 431 (1998) (stating that evidence must show that "more likely than not, the defendant's wrongful conduct caused the injury alleged."). If evidence points to two or more equally possible causes for the business loss, and the defendant is responsible for only one, the claim fails as a matter of law. *See 121 Assocs. Ltd. P'ship v. Tower Oaks Boulevard, LLC*, No. 0906 Sept. Term 2014, 2015 WL 7076013, at *10 (Md. Ct. Spec. App. Nov. 12, 2015). "[C]ausation evidence that is wholly speculative is not sufficient." *Lyon*, 120 Md. App. at 437.

CoesterVMS has demonstrated that its monthly revenues from Finance of America declined around the time of the email, but have generated no evidence that Skapinetz' email caused this loss. *See* ECF No. 70-4 at 1. In fact, the record supports the opposite. The recipient of the email, Finance of America's appraiser, attested that he put no faith in Skapinetz' email, calling it "crap," and affirmed to Coester at the time that he "like[d]" and "respect[ed]" Coester. ECF No. 10-2 at 1. Viewed most favorably to Coester and CoesterVMS, no evidence demonstrates that Skapinetz' email caused the proffered decline in revenues. *See Nat'l Bd. for Certification in Occupational Therapy, Inc. v. Am. occupational Therapy Ass'n*, 24 F. Supp. 2d 494, 506 (D. Md. 1998) (noting that lost revenue may be caused by numerous factors, including personal reasons unrelated to the conduct at issue).

Likewise, Coester and CoesterVMS have failed to demonstrate any connection between Skapinetz' email and the loss of LoanDepot as a CoesterVMS client. First, no evidence supports that LoanDepot even received the email. *See* ECF No. 10-2 at 2 (email sent only to Finance of America). In this respect, Coester's self-serving contention that LoanDepot terminated the relationship because of "too much noise regarding the Skapinetz and the Scheer matter" does not suffice, especially when considering that Coester and Scheer had been engaged in their own legal feud which had nothing to do with Skapinetz. ECF No. 98-2 at 5. Nor can Coester point to any temporal proximity between a single email sent to another client, Finance of America, and the decline of LoanDepot's relationship with CoesterVMS. Rather, CoesterVMS revenues from LoanDepot took a turn for the worse beginning September 2017, nearly *a year* after Skapinetz sent the email and five months after this lawsuit commenced. ECF No. 98-2 at 5; ECF No. 70-4 at 1–2 (corroborating revenue drop-off in September 2017 and complete end to revenues in June 2018). Taking all reasonable inferences in the light most favorable to the Coester and

CoesterVMS, no evidence links the email to LoanDepot parting ways with CoesterVMS. *See Campbell v. Lyon*, 26 F. App'x 183, 186 (4th Cir. 2001). Summary judgment is granted in Skapinetz' favor on this claim.

## II. Reconsideration of Previous Orders

CoesterVMS seeks reconsideration of the Court's prior orders for sanctions against Defendants, denial of leave to file a third-amended answer and counterclaim, and other discovery-related decisions. ECF No. 87. Courts may reconsider interlocutory orders "at any time prior to the entry of a final judgment." *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991); Fed. R. Civ. P. 54; *see also Taylor v. Brown*, No. 91-6642, 952 F.2d 397 (Table), 1991 WL 274856, at *1 (4th Cir. Dec. 27, 1991) ("An order denying leave to amend a complaint is interlocutory . . . ."). Reconsideration is warranted to address: (1) a change in controlling law; (2) additional evidence that was not previously available; or (3) a showing that that the prior decision was clearly erroneous or manifestly unjust. *See Boyd v. Coventry Health Care Inc.*, 828 F. Supp. 2d 809, 814 (D. Md. 2011); *Paulone v. City of Frederick*, No. CIV. WDQ-09-2007, 2010 WL 3000989, at *2 (D. Md. July 26, 2010). Federal courts are obligated to reach the correct judgment under law; however, a mere request "to reconsider a legal issue or to 'change its mind'" does not authorize relief. *Pritchard v. Wal Mart Stores, Inc.*, 3 F. App'x 52, 53 (4th Cir. 2001) (quoting *United States v. Williams*, 674 F.2d 310, 312 (4th Cir. 1982)).

Acting under Federal Rule of Civil Procedure 37, the Court imposed sanctions on CoesterVMS to limit its use of evidence after repeated discovery violations. ECF No. 85. CoesterVMS had not responded to the motion for sanctions, in apparent reliance on Local Rule 105.8, which states that "a party need not respond to any motion filed under Fed. R. Civ. P. 11 or

28 U.S.C. § 1927." The Rule further prohibits the Court from granting any motion "without requesting a response." Loc. R. 105.8.

CoesterVMS argues that the Court violated this Rule by imposing sanctions without requesting a response. However, Rule 105.8 governs only sanctions under Federal Rule of Civil Procedure 11 (requiring, *inter alia*, attorneys to verify that papers are not filed for an improper purpose) and 28 U.S.C. § 1927 (prohibiting unreasonable and vexatious multiplication of proceedings). Rule 105.8 makes no mention of Rule 37, which governs discovery. Because Rule 105.8 does not prohibit the Court from granting Rule 37 discovery motions without a response from the sanctioned party, the Court did not err when it granted the motion.[5]

CoesterVMS' other arguments are not new legally or factually. All issues that CoesterVMS raises now could have been brought in the original round of papers. A motion to reconsider "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of" the order. *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (quoting 11 Wright, *et al.*, Fed. Prac. & Proc. § 2810.1, at 127–28 (2d ed. 1995)); *see also Humane Soc'y of U.S. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, No. DKC 13-1822, 2017 WL 1426007, at *3 (D. Md. Apr. 21, 2017) (noting that the standards for reconsideration under Rules 59 and 60 provide guidance for reconsideration of interlocutory orders). Asserting that the Court "misunderstood" CoesterVMS's initial arguments does not bestow on the movant legitimate grounds for reconsideration. *See Hutchinson v. Staton*, 994 F.2d 1077, 1082 (4th Cir. 1993). Nor has CoesterVMS demonstrated any change in law, or how manifest injustice will result if the prior rulings stand. Accordingly, the motion for

---

[5] The Court further notes that Defendants were given ample warning and opportunity to either comply with discovery or defend its lack of compliance as justified. The Court held no fewer than five discovery-related status conferences in an attempt to resolve issues of Defendants' making. It blinks at reality to suggest that Defendants were not afforded ample process to address their protracted discovery violations.

reconsideration is denied.

### III. Withdrawal of CoesterVMS' counsel

At the close of discovery, counsel for CoesterVMS moved to withdraw from representation, citing difficulties in the attorney-client relationship and CoesterVMS' inability to afford representation. ECF No. 90. Whether to allow withdrawal is committed to the discretion of the Court. *Abbott v. Gordon*, No. DKC-09-0372, 2010 WL 4183334, at *1 (D. Md. Oct. 25, 2010). In determining the propriety of withdrawal, courts consider whether according the relief conforms to the Maryland Rules of Professional Conduct and whether it would potentially prejudice either party or disrupt the orderly administration of justice. *Al-Sabah v. Agbodjogbe*, No. ELH-17-730, 2019 WL 1472585, at *2 (D. Md. Apr. 3, 2019). Courts routinely permit withdrawal due to the client's inability to afford continued civil representation or deterioration of the attorney-client relationship. *Wright Sols., Inc. v. Wright*, No. CBD-12-0178, 2014 WL 981141, at *2 (D. Md. Mar. 12, 2014); *In re Schley*, No. 09-34182-DOT, 2012 WL 1616817, at *2 (Bankr. E.D. Va. May 9, 2012).

Counsel's description of failed attempts to communicate with CoesterVMS demonstrate a breakdown in the attorney-client relationship. *See* ECF No. 90 at 3. The Court accepts that the relationship is fractured, as reflected by CoesterVMS' "refusal" to allow counsel to respond to the summary judgment motions.[6] Accordingly, the Court grants counsel's motion to withdraw. However, because corporations must be represented, *see* Loc. R. 101.1.a, the Court stays the effect of the grant for 30 days so that CoesterVMS may obtain new counsel. Failure to do so, however, will result in this Court proceeding to the damages phase without the benefit of CoesterVMS' participation. *See Allied Colloids, Inc. v. Jadair, Inc.*, No. 96-2078, 139 F.3d 887

---

[6] Although the Court notes that, oddly, CoesterVMS did not have new counsel enter an appearance, suggesting its direction not to respond to motions was driven by financial rather than attorney-client concerns.

(Table), 1998 WL 112719, at *1 (4th Cir. Mar. 16, 1998) (affirming grant of default judgment against pro se corporation).

## IV. Conclusion

For the foregoing reasons, the Court grants the motions for summary judgment (ECF Nos. 98 & 100), denies the motion for reconsideration (ECF No. 87), grants the motion to withdraw (ECF No. 90), and denies without prejudice the requests for attorneys' fees. ECF Nos. 68 & 86. A separate Order follows.

6/24/2019  
Date

/S/  
Paula Xinis  
United States District Judge