**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARK SKAPINETZ, *

Plaintiff, *

v. * Civil Action No. 17-1098-PX

COESTERVMS.COM, INC., *et al.*, *

Defendants. *

***

**MEMORANDUM OPINION**

Defendant Brian Coester, Chief Executive Officer of the now-defunct corporation, CoesterVMS.com, Inc. ("CoesterVMS"), indisputably accessed the email account of Plaintiff Mark Skapinetz without permission, in violation of the Stored Communications Act (the "SCA"), 18 U.S.C. § 2701, *et seq.*, and companion common law torts of trespass to chattels, conversion, and intrusion upon seclusion. The Court has previously granted summary judgment in favor of Skapinetz as to these claims. *Skapinetz v. CoesterVMS.com, Inc.*, No. PX-17-01098, 2019 WL 2579120 (D. Md. June 24, 2019).

After the Court had granted summary judgment in favor of Skapinetz on liability, counsel for Defendants withdrew from the representation. ECF No. 90; *Skapinetz*, 2019 WL 2579120, at *9. Skapinetz moved for default judgment as to CoesterVMS for damages totaling $260,170 $192,502.36 in attorneys' fees under the SCA. ECF No. 112-1 at 7. Once it became clear that the damages trial would proceed as to Brian Coester (either pro se or through counsel), the Court announced it would render its damages decision as to CoesterVMS at the conclusion of the damages-only trial against Coester to avoid inconsistent judgments as between Coester and his closely held company, CoesterVMS. ECF No. 118. *See In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1262 (7th Cir. 1980) (noting that "[t]he possibility of two distinct determinations as to the

damages arising out of a single price-fixing claim is, indeed, an inconsistency", and that the result of "inconsistent verdicts as to damages . . . is erroneous and must be avoided"); *Anita's New Mexico Style Mexican Food, Inc. v. Anita's Mexican Foods Corp.*, No. 97-510-A, 1998 WL 526770, at *2 (E.D. Va. Apr. 16, 1998) (holding that "the assessment of damages against the defaulting defendant [ ] should await the outcome of Plaintiff's claims against [the other defendant] in order to avoid the entry of inconsistent damage awards."); *RBC Bank (USA) v. Epps*, No. 4:11-00124-RBH, 2012 WL 3308227, at *4 (D.S.C. Aug. 13, 2012).

Additionally, despite the straightforward nature of the case, the parties have engaged in protracted discovery with the full complement of heated and pointless disputes. As a result, the Court has previously sanctioned Coester and CoesterVMS for an array of discovery violations. *See, e.g.*, ECF Nos. 63, 66, 68, 85. The Court also knew that the case was headed to a damages-only trial. Accordingly, the Court also deferred reaching whether costs and attorneys' fees were warranted for discovery violations until reaching whether costs and fees would be awarded under the SCA. *Skapinetz*, 2019 WL 2579120, at *5.

On December 14 and 29, 2020, the Court conducted the damages-only bench trial. The Court heard testimony from Skapinetz, his wife Jennifer Skapinetz, Brian Coester, and CoesterVMS's former Chief Compliance Officer, Toni Bright, and admitted several exhibits. Based on the following findings of fact and conclusions of law, the Court awards Skapinetz $8,000 in actual damages, $1,000 in pain and suffering, and $92,222.50 in attorneys' fees and $6557.61 in costs under the SCA as to Defendant Brian Coester.

As to the other outstanding motions, the Court now grants Skapintez' motion for default judgment against CoesterVMS and imposes an identical award for which defendants will be

jointly and severally liable.[1] The Court also awards remaining discovery sanctions totaling $687.50 in fees and $598 in costs that had been ordered but not accounted for in the attorneys' fees and costs award under the SCA.

## I. Findings of Fact

For many years, Skapinetz and Coester worked together in the residential and commercial appraisal industry. Skapinetz, a self-employed real estate appraiser, performed appraisals as a subcontractor for appraisal management companies such as CoesterVMS. *See* Trial Tr. Vol. I, 18–19. Skapinetz began working with CoesterVMS in 2013, and since then has performed between 50 and 60 appraisals for CoesterVMS in the Atlanta metropolitan area. Trial Tr. Vol. I, 21; Vol. II, 25–26.

Shortly before the events giving rise to this case, the relationship between Coester and Skapinetz soured. *See* Trial Tr. Vol. I, 70–71. In Skapinetz' view, CoesterVMS took too great a percentage of the appraisal fees and did not pay appraisers in a timely manner. *Id.*; Trial Tr. Vol. II, 26–27. Skapinetz voiced his displeasure to CoesterVMS via emails, in which he accused the company of violating fee guidelines and threatened to alert regulatory authorities. Trial Tr. Vol. I, 146. Skapinetz also emailed at least one CoesterVMS client to warn him that the company was "criminal and fraudulent." *Id.* at 69; Trial Tr. Vol. II, 29–30.

As fallout from this fractured business relationship, Brian Coester set out to access Skapinetz' email accounts to learn whether Skapinetz had disparaged CoesterVMS to others. Coester admitted that he took Skapinetz' passwords from CoesterVMS's vendor database, used

[1] The Court had previously denied without prejudice to refile Skapinetz' motion for default judgment against CoesterVMS at the conclusion of this damages trial. Skapinetz' now seeks a default judgment award against CoesterVMS which the parties addressed at trial. Trial Tr. Vol. I, 5; ECF No. 138 at 1.

the password to access Skapinetz' personal and business email accounts and printed four emails. Trial Tr. Vol. I, 99; Vol. II, 31–32, 34-36

Sensing that he had crossed an important ethical line, Coester next contacted his Chief Compliance Officer, Toni Bright, to seek her advice. *Id.* at 36, 38. Bright immediately informed Coester that accessing a CoesterVMS subcontractor's email accounts violated company policy, was unethical, and he should not do it again. *See* Trial Tr. Vol. I, 135. Coester followed Bright's advice. *See id.* at 36.

At the same time, Skapinetz' email provider notified him that his accounts had been accessed from a computer located in Rockville, Maryland. Trial Tr. Vol. I, 27–28. Because Skapinetz lives and works in Georgia, this notice placed Skapinetz on immediate and high alert. Skapinetz next received an email from Coester informing him that CoesterVMS knew that Skapinetz had sent disparaging anonymous emails to CoesterVMS clients and planned to take legal action. *Id.*; J. Ex. 9. Skapinetz went into "panic mode" because at that point, he knew that his email accounts—which included sensitive health information, financial records, and correspondence related to his business—had been breached. Trial Tr. Vol. I, 28, 31–32.

As a result, Skapinetz became "obsessed" with investigating this intrusion. Trial Tr. Vol. I, 38–40. He contacted his local police department, law enforcement in Rockville, the Maryland Attorney General's office, and the FBI. *Id.* at 33–34. Receiving less than satisfactory assistance, Skapinetz believed he was getting "the runaround." *Id.* at 35. He also purchased security software for his computer and urged his internet service provider to investigate how his accounts were breached. The provider explained that it "had spoken to the parties involved, and [] took care of everything", but did not provide any further details. *Id.* at 34–35.

By his own calculation, Skapinetz spent roughly one hundred total hours investigating the breach. Trial Tr. Vol. I, 37. Skapinetz further estimates that eighty of those hours were during his workdays. *See* ECF No. 138 at 3, n. 1. As his bi-weekly salary translates to roughly $100 per hour, Skapinetz claims lost income totaling $8,000. *Id.*; Trial Tr. Vol. I, 17.

Eventually, Skapinetz learned that Brian Coester had accessed his email accounts. Skapinetz asserts, curiously, that even though he now knew the source of the breach, his anxiety and fear worsened. Trial Tr. Vol. I, 53–57. Skapinetz explains that because he viewed Coester as an influential figure in the real estate business with far-reaching industry connections, he feared Coester would set out to ruin him. *Id.* at 21, 25–26, 60–61.

The two men next engaged one another via Twitter about the email breach. Skapinetz confronted Coester, who denied accessing Skapinetz' email account. Pl. Ex. 53. Coester also offered to meet with Skapinetz in Atlanta and help him find more work, all of which, according to Coester, had been part of an effort to deescalate the situation. *Id.*; Trial Tr. Vol. II, 37–38. Skapinetz, however, was not mollified. So, several months after his email had been accessed, viewing all other measures as futile or insufficient, Skapinetz traveled to Maryland with the sole purpose of swearing a criminal complaint against Coester for interception of electronic communications in violation of Maryland law. Trial Tr. Vol. I, 60; Md. Code Ann., Ct. & Jud. Proc. § 10-402. State prosecutors ultimately dropped the criminal charges against Coester.

Skapinetz attests that even at present, several years after Coester accessed the email account, Skapinetz still suffers anxiety that he attributes to this breach. He specifically details how his drinking increased, as did his marital difficulties. Trial Tr. Vol. I, 40–41. Skapinetz' wife, Jennifer, corroborated her husband's stress and anxiety, and believes that the email breach triggered his mental health decline. *Id.* at 155–58. She particularly describes how this matter

added to their stress in attempting to have a child and, in Jennifer's view, contributed to Skapinetz' drinking. *Id*.

## II. Conclusions of Law

At trial, Skapinetz pressed for an array of damages, principally available under the SCA totaling over one million dollars.[2] Specifically, Skapinetz seeks $160,000 in compensatory damages—$8,000 in lost wages, $2,000 in statutory damages, and $150,000 for pain and suffering; punitive damages of $200,000 against Coester, $400,000 against CoesterVMS; and attorneys' fees and costs totaling $282,167.61. The Court discusses each in turn.

### A. Actual Damages

The SCA permits the Court to award (1) equitable or declaratory relief; (2) damages as set forth in § 2707(c); and (3) reasonable attorneys' fees and other litigation costs. 18 U.S.C. § 2707(b). Section 2707(c) delineates the kind of allowable monetary damages. It provides:

> The court may assess as damages in a civil action under this section the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000. If the violation is willful or intentional, the court may assess punitive damages. In the case of a successful action to enforce liability under this section, the court may assess the costs of the action, together with reasonable attorney fees determined by the court.

As for actual damages, the Court credits that Skapinetz has incurred $8000 in lost wages. He testified that he spent about eighty work hours investigating and attempting to remedy the security breach attributable to Coester's SCA violation. This included researching and purchasing security software, buying a new phone, and contacting his internet service provider

[2] The Court recognizes that Coester has also committed several common law torts for which actual and damages are allowable. However, under the one wrong, one recovery rule, Coester is entitled only to those actual damages which compensate him for his injuries. *See United States v. Rachel*, 289 F. Supp. 2d 688, 697 (D. Md. 2003) (quoting *Kramer v. Emche*, 64 Md. App. 27, 40 (1985)); *Bibbs v. Toyota Motor Corp.*, 304 Ga. 68, 75 (2018). As for punitive damages, Skapinetz urges an award pursuant to both the SCA and Georgia law. As discussed *infra*, the nature of Coester's offense simply does not warrant a punitive damages award under either the SCA or applicable common law standards.

and multiple law enforcement agencies for information. Trial Tr. Vol. I, 33–34, 37. Further, Skapinetz credibly estimated his salary to approximate a $100 hourly rate. Thus, the Court will award $8,000 in lost wages.

Skapinetz also seeks $150,000 in damages for pain and suffering. He asks the Court to value his ongoing distress at $100 a day for the "1500 days [he] has been suffering and seeking just closure." ECF No. 138 at 7. Coester responds that Skapinetz has failed to demonstrate that the pain and suffering calculation bears any reasonable relationship to the offense, and thus Skapinetz should not be granted any pain and suffering award.

Although the SCA is silent on the quantum of proof necessary to establish pain and suffering, it is nonetheless fundamental that a plaintiff must show some relationship between the defendant's wrongdoing and the emotional damages claimed. In this respect, the factfinder retains wide discretion in determining what mental anguish, suffering, and consequent damages are related to the defendant's misconduct. *See* § 8:8 Pain and Suffering: No Definitive Standard—The Jury's Discretion, 2 Stein on Personal Injury Damages Treatise (3d ed. 2021).

To be sure, Skapinetz and his wife testified to the anguish that he suffered over the email breach. They also testified that his anxiety and depression went on for months, if not years; that he began to drink heavily, and the couple's efforts to conceive suffered. Although sympathetic to these very real difficulties, the Court finds that they bear an outsized relationship to the actual offense.

Coester, on *one* occasion, committed a targeted SCA offense. Coester searched solely for emails related to Skapinetz' disparagement of CoesterVMS and printed four of them. Immediately, Skapinetz learned of the breach and quickly put security measures in place to prevent further unauthorized access. Because the offense was objectively narrow in scope, the

Court credits that Skapinetz suffered a brief period of emotional harm related to the offense. The original intrusion was startling and, no doubt, produced some anxiety during the time it took Skapinetz to protect his privacy by installing computer security software, changing passwords, and contacting his internet service provider who assured him they had taken "care of everything." Trial Tr. Vol. I, 34. To compensate him for this, and impose on the violator the commensurate responsibility, the Court awards $1000 in pain and suffering.

Beyond this, the Court cannot credit that Coester's misconduct contributed to Skapinetz' years-long emotional and marital undoing. Skapinetz presented at trial as a sophisticated businessperson. He testified to taking on the perceived ills of CoesterVMS in the industry and as reflected in the email that Skapinetz sent to at least one CoesterVMS client. The Court cannot reconcile a brave and fortified Skapinetz who went on this offensive with CoesterVMS prior to the breach, with the emotionally fragile man whose fear of Coester caused him protracted emotional distress. $1000 adequately accounts for Skapinetz' pain and suffering related to Coester's wrongdoing.

**B. Statutory Damages**

Skapinetz also seeks $2000 in statutory damages. Although the parties assume that the Court may award both actual and statutory damages, ECF Nos. 138 at 1; 139 at 4–5, the SCA provides otherwise. Section 2707(c) plainly states that a court "may assess as damages in a civil action under this section the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation . . . ." The subsection further states that if such damages are proven but are less than $1000, an award of at least $1000 must be imposed. *Id.* ("but in no case shall a person entitled to recover receive less than the sum of $1,000."). The plain and unambiguous reading of this provision dictates that the $1000 acts as a floor to an

actual damage award, guaranteeing that a party entitled to relief will receive at least $1000; by contrast, where a plaintiff demonstrates actual damages in excess of $1000, he is not entitled to an additional statutory penalty of $1000. *See Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 968–69 (11th Cir. 2016).

As the Eleventh Circuit Court of Appeals in *Vista Mktg., LLC v. Burkett* explained, this reading of § 2707(c) is further supported by the legislative history of the SCA. *See* 812 F.3d at 968–69. Congress enacted the SCA as part of the Electronic Communications Privacy Act of 1986, which also amended the Wiretap Act's damages provisions at 18 U.S.C. § 2520. *Id.* at 967–69. The amended Wiretap Act plainly allows a court to assess "whichever is the greater of (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; *or* (B) statutory damages of whichever is the greater of $100 a day for each violation or $10,000." 18 U.S.C. § 2520(c) (1986) (emphasis added). The Wiretap Act thus provides the flexibility to impose either statutory or actual damages "whichever is greater." *Id. See also Vista Mktg.*, 812 F.3d at 968; *Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199, 207 (4th Cir. 2009) (distinguishing Wiretap Act damages provision as explicitly permitting imposition of actual or statutory damages, whichever is greater). Section 2707(c) provides no such choice. Rather, the $1000 statutory penalty is triggered only where actual damages dips below that same amount.

Other courts have adopted this reasoning. *See Shefts v. Petrakis*, 931 F. Supp. 2d 916, 918 (C.D. Ill. 2013) ("§ 2707(c) provides a means of calculating damages allowing the court to assess the sum of actual damages and any profits, but in the absence of those variables, a person entitled to recovery can at least recover the statutory minimum."); *Bernstein v. MyJoVE Corp.*, No. 2012-03183, 2018 WL 11247220, at *6 (Mass. Super. Jan. 12, 2018) (declining to impose

both statutory and actual damages). This Court will as well. Accordingly, because Skapinetz has proven that he incurred actual damages award in excess of $1000, the Court declines to impose statutory damages.

**C. Punitive Damages**

Under the SCA, the factfinder retains discretion to award punitive damages where the Defendant's violation is "willful or intentional." 18 U.S.C. § 2707(c); *Van Alstyne*, 560 F.3d at 209. To put some teeth into the SCA, punitive damages are available even in the absence of actual damages to deter potential violators from engaging in conduct prohibited under the Act. *Id*. In determining whether the reprehensibility of Defendants' conduct warrants punitive damages, the Court may look to such factors as "[whether] the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 576–77 (1996)).

Georgia law similarly permits the factfinder wide discretion in whether to award punitive damages. *See* Ga. Code. Ann. § 51-12-5.1(d). Any such award must "bear a reasonable relationship to compensatory damages," and "may not be grossly out of proportion to the severity of the offense." *Gore*, 517 U.S. at 576, 580. Punitive damages are permissible only where the plaintiff has "proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Ga. Code. Ann.

§ 51-12-5.1(b). The purpose of "punitive damages" or "vindictive damages" as to the common law claims is "solely to punish, penalize, or deter a defendant." Ga. Code. Ann. § 51-12-5.1(c).

Skapinetz seeks punitive damages of $200,000 against Coester and $400,000 against CoesterVMS pursuant to the SCA and Georgia common law, arguing that such damages are warranted to punish Defendants' willful misconduct and obstructionist litigation tactics. ECF No. 138 at 7 (citing *N. Am. Mktg. Solutions, Inc. v. Wright*, No. 13-C-472, 2014 WL 2991127, at *1 (E.D. Wis. July 1, 2014)). The Court cannot agree.

Indisputably, Coester's SCA violations are willful and intentional. Coester admitted that he purposely accessed Skapinetz' email accounts without permission. Trial Tr. Vol. II, 31–32. But when considering the relative "reprehensibility of the defendant's conduct," *Gore*, 517 U.S. at 575, the actual violations are minor in scope and nature. As compared to other SCA misconduct that has supported punitive damages awards, none are so circumscribed and short lived as this. *See, e.g., Brown Jordan Int'l, Inc. v. Carmicle*, No. 14-60629, 2016 WL 815827, at *44 (S.D. Fla. Mar. 2, 2016) (awarding punitive damages equal to actual damages where company accessed employee's personal email accounts multiple times over at least six month period); *Wyatt Tech. Corp. v. Smithson*, No. 05-1309-DT (RZx), 2006 WL 5668246, at *9, * 11 (C.D. Cal. Aug. 14, 2006), *rev. on other grounds*, 345 F. App'x 236 (9th Cir. 2009) (awarding $100,000 in punitive damages where violator obtained trade secrets by setting up system to continuously monitor victim's email account); *Van Alstyne*, 560 F.3d at 201 (discussing jury award of $100,000 punitive damages where employer regularly accessed employee's personal email account for over a year); *Condon v. Condon*, No. 07-4985-JFW (SSx), 2008 WL 11338437, at *8 (C.D. Cal. June 6, 2008) (assessing $2,500–$5,000 against each defendant for

using key and screen monitoring technology to gain access to plaintiff's personal email and subsequently dispersing copies of personal and business emails).

Nor can the Court find that punitive damages are necessary to deter Coester from committing future similar wrongdoing. After printing four emails, Coester immediately sensed he had done wrong. He notified the company's Chief Compliance Officer, Bright, and took her advice to not probe Skapinetz' email accounts. And although he considered using the emails in litigation unrelated to Skapinetz, ultimately Coester made no use of them. *Cf.* Trial Tr. Vol. II, 34, 38. Because Coester never accessed the email accounts again or otherwise profited from the four emails, the Court cannot conclude that he must be further deterred from committing future SCA violations.

Skapinetz presses hard that Coester's dilatory tactics during litigation support a hefty punitive damages award. ECF No. 138 at 7–8. Skapinetz, however, provides little authority for this Court to impose punitive damages on this basis alone. He relies solely on an unreported, out of district decision, *North American Marketing Solutions, Inc. v Wright*, to stand for the proposition that punitive damages may be warranted where the defendant "refused to participate in [the] litigation in an apparent attempt to make it more difficult for" the plaintiff to obtain relief. 2014 WL 2991127, at *1. But the *North American* Court also noted that the punitive damages award—reached by a jury—was justified as "proportional to" the Defendant's unjust profits realized from his SCA breaches. *Id.* The Court further reasoned that the plaintiff's request for attorneys' fees was supported because "the hourly rates and work performed by [the plaintiff] in pursuing this litigation were necessary and reasonable." *Id.* at *2. This Court cannot say the same here. *See infra* at p. 13.

Moreover, this Court made sure to sanction Coester and CoesterVMS along the way for discovery violations. With these prior sanctions as a guide, the Court cannot justify awarding punitive damages based on the same misconduct, and certainly not orders of magnitude greater than the harm caused by Coester's misconduct. This is especially equitable when considering that the discovery violations, while serious, more pointedly reflect the fractured relationship between Coester and Skapinetz and their mutual inability to put this relatively narrow SCA violation into proper perspective. For these reasons, the Court finds that punitive damages are not warranted.

**D. Attorneys' Fees**

Skapinetz seeks to recover attorneys' fees under the SCA for five lawyers, one paralegal and over 736 hours litigating this matter for a total of nearly $300,000 in costs and fees.[3] Although the SCA undoubtedly allows a prevailing party to seek fees, they must be reasonable. This request is not that. Consequently, it will be pared back substantially.

The SCA provides that "[i]n the case of a successful action to enforce liability under [the SCA], the court may assess the costs of the action, together with reasonable attorney fees determined by the court." 18 U.S.C. § 2707(c); *see also* 18 U.S.C. § 2707(b)(3). When assessing the reasonableness of an attorneys' fee award, the Court must first determine a lodestar figure by ascertaining "the number of hours reasonably expended on the litigation multiplied by a

[3] This request folds in costs and fees associated with prior discovery-related sanction orders, for which the Court previously deferred resolution of the final amount to avoid double recovery. *Skapinetz*, 2019 WL 2579120, at *5. After a careful review of the record, the only remaining unresolved award is the fees and costs sought in connection with rescheduling Coester's deposition after the criminal charges against him were dropped. *See* ECF Nos. 66, 68, 72. The Court now awards $687.50 in fees for Arnold Abraham's three hours of travel to and attendance at the deposition and for Glyn Cashwell's half hour spent preparing the fee request letter. The Court also awards $598 in related costs. *See* ECF No. 68. To the extent that Skapinetz seeks fees and costs as a sanction for the discovery violations related to Toni Bright's deposition and the motion for sanctions (ECF Nos. 70, 79), the Court's prior order granting relief was limited to non-monetary sanctions. *See* ECF No. 85. Regardless, the time expended preparing those pleadings and on related discovery efforts are included in Skapinetz' SCA fee request, which the Court addresses below.

reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *see also Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). In making this determination, the Court is guided by twelve non-exclusive factors: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fee awards in similar cases. *Robinson*, 560 F.3d at 243–44.

The Court turns first to the hourly rates for each counsel who worked on this case. For each of the five lawyers Skapinetz chose to employ, he asks this Court to go substantially above the presumptively reasonable hourly rate set forth in the Local Rules, and without sound justification supporting the request. *See* Loc. R., App. B.[4] Abraham, the lead attorney, has billed his work at $375 per hour, well beyond the rate commensurate with his legal experience ($150–$225). ECF No. 112-1 at 14; Loc. R., App. B(3) (guidelines rate for attorney with less than five years' experience is $150–$225). Skapinetz cites to Abraham's years of cybersecurity experience prior to entering law school to justify the higher rate. But in this Court's view, such

[4] Skapinetz argues that the requested hourly rates are reasonable under the Laffey Matrix. ECF No. 112-1 at 14; J. Ex. 15. The Laffey Matrix is "an official statement of market-supported reasonable attorney fee rates which was adopted, and is periodically updated, by the United States Court of Appeals for the District of Columbia." *Robinson*, 560 F.3d at 244 (citing *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 24–25 (D.C. Cir. 1984)). But it is not a proxy for reasonable rates for attorneys in this district. *See id.* at 245–46. Without grounds to deviate from the presumptively reasonable rates for this legal market, the Court refuses to adopt the *Laffey* matrix.

subject matter expertise does not equate to commensurate *legal* experience.[5] Put plainly, the particular facts of this unsophisticated email breach do not call for much cybersecurity know-how. Thus, even when considering Abraham's prior cybersecurity experience, the Court must reduce his hourly rate from $375 to $200.

The Court likewise reduces the requested rates for the remaining four lawyers. As associates, Cashwell and Egan bring no specialized training or experience to this case. Accordingly, the Court will use an hourly rate of $175 for Cashwell and $150 for Egan. The Court also stays within the presumptive range for attorneys Eric Menhart with thirteen years' experience and Curtis Cooper with nineteen years' experience. Menhart's rate will be $325 and Cooper's will be $425 per hour. As to paralegal Nguyen, her $100 per hour rate is well within this Court's presumptively reasonable range and will remain unchanged.

Having established the proper hourly rates for counsel, the Court next turns to the reasonableness of the hours billed. This assessment requires careful review of billing records to determine the tasks necessary to prosecute the SCA claim. *See Two Men & A Truck/Int'l, Inc. v. A Mover Inc.*, 128 F. Supp. 3d 919, 925 (E.D. Va. 2015) (quoting *EEOC v. Nutri/Systems Inc.*, 685 F. Supp. 568, 573 (E.D. Va. 1988). Where the records obfuscate the reasonableness of the attorney hours expended, the Court may reduce the award by a stated percentage to address "excessive vagueness" in the claimed tasks, double billing, or to adjust for an "excessive number of hours sought." *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, No. MGJ-95-309, 2002 WL 31777631, at *13 (D. Md. Nov. 21, 2002)*; see also Hensley*, 461 U.S. at 433. The Court should also adjust the award according to the "degree of success enjoyed by the plaintiff" so that

[5] The Court takes judicial notice that Abraham had graduated from law school only months prior to entering his appearance in this case. *Compare* Maryland Attorney Listing, https://mdcourts.gov/cgi-bin/cstf.pl?inputname=Abraham&firstname=Arnold &submit=Submit (last visited May 24, 2021) *with* ECF No. 15.

Defendants do not foot the bill for inadvisable or imprudent litigation decisions pursued by plaintiffs' counsel. *Cf. McAfee v. Boczar*, 738 F.3d 81, 92–93 (4th Cir. 2013) (concluding district court erred in overstating the success of prevailing party). This includes comparing the fees sought to the damages award obtained. *Id.*

Skapinetz requests reimbursement for 736 attorney hours to litigate Coester's singular access to two email accounts and downloading of four emails. ECF No. 138-1. After a careful review of the manner in which litigation tasks were staffed and hours billed, the Court concludes that the request is excessive and must be reduced.

To begin, more than one attorney customarily attended depositions, hearings and trial. *Compare, e.g.*, J. Ex. 12 at 5–6 (Abraham deposition attendance) *with* J. Ex. 12 at 9 (Cashwell deposition attendance). *See also* fn. 5. Even when considering the nature of the discovery disputes and other issues plaguing this case, the Court sees no reason to double staff events that are a regular part of litigation. *See* Loc. R., App. B(2) (providing that generally only one lawyer for each party shall be compensated for any given task absent justification). And the Court has been given no good grounds to find as automatically reasonable the need for multiple attorneys on these tasks. Thus, where such billing has occurred, the Court has only credited hours for Abraham's participation as lead counsel.[6]

With respect to trial, the Court cannot find it was reasonable for counsel to spend a whopping 138.2 hours preparing and briefing the damages issues at trial. This time amounts to nearly three-and-a-half work weeks of doing *nothing else* but preparing for a damages-only

---

[6] The award subtracts Cooper's simultaneous attendance with Abraham at conference calls (J. Ex. 12 at 10 on 7/30; J. Ex. 14 on 10/28/19 and 10/27/20), client and witness preparation (ECF No. 138-1 at 2 on 11/7, 11/14, 12/10 and 12/11), one meeting (ECF No. 138-1 at 2 on 12/7), and trial (ECF No. 138-1 at 3 on 12/14 and 12/29), totaling 24.5 hours. The Court similarly subtracts 12.9 hours for depositions that Cashwell attended with Abraham. *See* J. Ex. 12 at 9 (billing depositions attended on 9/21, 10/2, 10/4, 10/16). Nguyen's hours will be reduced by 3.5 hours to account for her attendance at depositions with Abraham. *See* J. Ex. 12 at 9 (billing depositions on 10/2 and 10/16).

bench trial that lasted barely one trial day. Trial involved two very short witnesses and two longer ones. Although several documents were submitted as potential exhibits, only 27 were introduced and admitted into evidence. To be sure, Skapinetz' counsel expended much effort at trial attempting to convince the court that prior discovery battles were relevant to the punitive damages, and that the Court should accept prior pleadings as trial exhibits. *Cf.* ECF Nos. 138 at 7–9; 112-1 at 10; Trial Tr. Vol. I, 43–53; Vol. II, 7–9. Ultimately the Court rejected those attempts. The Court cannot see how it would be equitable to impose on Defendants the cost of counsel's tilting at legal windmills. *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 296 (1st Cir. 2001) ("[I]t is the court's prerogative (indeed, its duty) to winnow out excessive hours, time spent tilting at windmills, and the like."); *see also Corral v. Montgomery Cnty.*, 91 F. Supp. 3d 702, 717–19 (D. Md. 2015) (reducing fee award where straightforward litigation by subject matter experts was overbilled).

Counsel similarly over-litigated several motions. For example, after this Court granted summary judgment on liability, counsel billed nearly thirty attorney hours drafting a damages-only motion for default judgment against CoesterVMS. J. Ex. 12 at 8, 10. The motion necessarily concentrated on the same categories of damages on which the trial focused, and for which counsel claimed the additional 138 hours of trial preparation time. Yet counsel asks for thirty *more* hours for having briefed the same issues previously. When considered as a whole, the time expended does not bear a reasonable relation to the task at hand.

The billing records are also not a model of clarity. As to double billing, the attorneys routinely billed twice the number hours they spent litigating the "claim" when such litigation also involved litigating discovery disputes. *See* J. Ex. 12 at 3-10. This duplicative billing pattern

appears in several records for hours submitted for Abraham, Cashwell[7], and Nguyen. *See* J. Ex. 12 at 9. To adjust for the double billing, the Court reduces the hours as follows: Abraham - 29.4; Cashwell -36.2, and Nguyen - 2.1.

Other records are vague or "block billed," which complicates ascertaining the reasonableness of counsel's efforts. Many entries are barebones in description, such as: "client emails," "co-counsel call, client emails," and "work on MSJ". *See, e.g.*, J. Ex. 12 at 3, 4, 7, 9; J. Ex. 13 at 2. And others combine multiple activities, such as "email correspondence with co-counsel and opposing counsel, schedule Zoom meeting for Dec. 7, case review" and "Emails, phone call to Co-Counsel, hearing preparation with client and witness." *See* ECF No. 138-1 at 2, 3; J. Ex. 12 at 9, 10. Because the Court cannot discern the amount of time spent on any given task, the Court cannot assess the reasonableness of time expended. *See, e.g.*, *Miller v. U.S. Foodservice, Inc.*, No. CCB-04-1129, 2006 WL 2547212, at *1, *3 (D. Md. Aug. 30, 2006) (reducing fee award for block billing); *Project Vote/Voting for Am., Inc. v. Long*, 887 F. Supp. 2d 704, 716–17 (E.D. Va. 2012) (same).

These deficiencies—especially in light of the straightforward nature of the SCA claim—compel the following corrections. *See Everhart v. Bd. of Educ. of Prince George's Cty.*, No. PJM-11-1196, 2016 WL 8376453, at *4, *5 (D. Md. June 17, 2016) (citing *Thompson*, 2002 WL 31777631, at *13 (D. Md. Nov. 21, 2002)). The Court first excludes hours attributable to events attended by more than one attorney and any clear double billing so that only one event and one counsel is compensated accordingly. Next, the Court reduces the remaining hours by one-third

[7] Cashwell appears to have double billed as to work attributable to both the claims and counterclaims. J. Ex. 12 at 9. Skapinetz is entitled to fees under the SCA for work performed on the counterclaim, and because the Court cannot legitimately discern which portion of this work is attributable to the claim as opposed to the counterclaims (because the records simply bill the nearly identical hours in both columns), the affected hours as billed must be stricken entirely.

to account for vague block billing and similar over-lawyering. Applying the presumptively reasonable hourly rates discussed above, the Court arrives at the following:

| | **Reduced Hourly Rate** | **Hours Awarded** | **Total** |
|---|---|---|---|
| Arnold Abraham | $200 | 286.7 | $57,340 |
| Curtis Cooper | $425 | 44.3 | $18,827.50 |
| Eric Menhart | $325 | 17.5 | $5,687.50 |
| Glyn Cashwell | $175 | 21.3 | $3727.50 |
| Colleen Egan | $150 | 39 | $5,850.00 |
| Nguyen | $100 | 7.9 | $790.00 |

This brings the total attorneys' fees to $92,222.50.

The Court must lastly determine whether this fee is commensurate with the relative success of the claims. *See McAfee*, 738 F.3d at 92. Although roughly tenfold greater than this Court's final judgment in Skapinetz' favor, the Court concludes the fee is warranted. The Court has already calibrated downward the award for counsel's unsuccessful efforts, duplicative and vague billing, and general over-litigation of the case. Further, taking into account Defendants' obstinance in discovery which necessitated substantive responses throughout the litigation, the final award represents fair compensation for the success achieved in this matter. Thus, the Court awards Skapinetz $92,222.50 in attorneys' fees and $6,557.61 in costs under the SCA.[8]

## III. Conclusion

Based on the record evidence, the Court will award Skapinetz $8000 in pecuniary damages and $1000 for pain and suffering. The Court declines to award punitive or statutory damages. The Court awards a total of $92,222.50 in attorneys' fees and $6,557.61 in costs

[8] Although Skapinetz was correct to omit fees and costs associated with defending Coester's $20,000,000 business interference counterclaim, the Court nonetheless recognizes that the counterclaim was wholly unsupported and ultimately baseless. *Skapinetz v. CoesterVMS.com, Inc.*, No. 8:17-CV-01098-PX, 2019 WL 2579120, at *7 (D. Md. June 24, 2019). That Skapinetz had to litigate this counterclaim illustrates the considerable effort that he expended more generally to obtain a favorable verdict in the end.

compensable under the SCA. Finally, as to the monetary sanction for discovery violations, the Court awards Skapinetz a total of $687.50 in fees and $598 in costs.

A separate order follows.

4/27/21
Date

/s/
Paula Xinis
United States District Judge